# In the United States Court of Federal Claims

### No. 14-841C
### (Filed: January 17, 2018)

* * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |
|---|---|
| **AMPERSAND CHOWCHILLA BIOMASS, LLC, and MERCED POWER, LLC,** | Summary Judgment; American Recovery and Reinvestment Act, Pub. Law. No. 111-5, Div. B, tit. I, § 1603, 123 Stat. 115, 364-66; Open-Loop Biomass Facility; Grant; 26 U.S.C. §§ 45, 48; Statutory Interpretation; "Placed in Service"; Oglethorpe Factors; Treas. Reg. 1.46-3(d)(1). |

**AMPERSAND CHOWCHILLA
BIOMASS, LLC, and MERCED
POWER, LLC,**

  **Plaintiffs,**

  **v.**

**THE UNITED STATES,**

  **Defendant.**

Summary Judgment; American
Recovery and Reinvestment Act,
Pub. Law. No. 111-5, Div. B, tit. I,
§ 1603, 123 Stat. 115, 364-66;
Open-Loop Biomass Facility;
Grant; 26 U.S.C. §§ 45, 48;
Statutory Interpretation; "Placed
in Service"; Oglethorpe Factors;
Treas. Reg. 1.46-3(d)(1).

* * * * * * * * * * * * * * * * * * * * * * * * * *

Stephen G. Leatham, Heurlin, Potter, Jahn, Leatham, Hotlmann & Stoker, P.S., 211 E. McLoughlin Blvd., Suite 100, Vancouver, Washington 98663 for Plaintiffs.

David A. Hubbert, David I. Pincus, G. Robson Stewart, Courtney M. Hutson, Carl Wasserman, and Brian J. Sullivan, U.S. Department of Justice, Tax Division, Court of Federal Claims Section, P.O. Box 26, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

_____

## OPINION AND ORDER
_____

**WILLIAMS**, Judge.

Section 1603 of the American Recovery and Reinvestment Tax Act of 2009 ("ARRA"), Pub. L. No. 111–5, Div. B, tit. I, § 1603, 123 Stat. 115, 364–66 (2009) ("Section 1603" or "§ 1603") requires the Secretary of the Treasury to provide a grant, upon application, to individuals who "place[] in service specified energy property" in 2009 or 2011 for a portion of the expense of such property. Plaintiffs Ampersand Chowchilla Biomass, LLC ("Chowchilla") and Merced Power, LLC ("Merced") own open-loop biomass facilities in Chowchilla, California, and Merced, California, respectively. Plaintiffs submitted Section 1603 grant applications for both facilities to the U.S. Department of the Treasury ("Treasury") in October 2011, which Treasury denied on the basis that both facilities had been "placed in service" in 2008. Plaintiffs thereafter brought suit against the United States in this Court, alleging that the Government improperly failed to provide Plaintiffs with Section 1603 grants. The central dispute in this case is when the facilities were "placed in service."

The parties filed cross-motions for summary judgment.  Plaintiffs claim that the facilities were both "placed in service" on August 28, 2011, while Defendant claims that the facilities were placed in service in 2008.  Defendant further argues that Plaintiffs violated material terms of the Section 1603 program that disqualify them from eligibility.  Finally, Defendant contends that Plaintiffs' claims are statutorily barred because the prior owners took certain tax credits for these same facilities.  Genuine issues of material fact prevent the Court from granting either motion.[1]

## Background[2]

### The Subject Biomass Facilities

Plaintiffs Ampersand Chowchilla Biomass, LLC and Merced Power, LLC are two wholly owned subsidiaries of Global Ampersand, LLC, an entity wholly owned by ACM California, LLC, which in turn is wholly owned by Akeida Environmental Fund LP ("Akeida Environmental").  Pls.' Ex. 6.[3]  Akeida Capital Management ("Akeida") controls Akeida Environmental.  Id.

The Chowchilla and Merced open-loop biomass facilities were constructed by California Agricultural Power Corporation ("CAPCO") and began operations in the late 1980s.  Pls.' Ex. 1, at 1.  The facilities were shut down and mothballed in 1995, and were eventually sold to Global Commons, LLC ("Global Commons").  Id.  Global Commons negotiated power purchase agreements ("PPAs") with Pacific Gas & Electric Co. ("PG&E") in 2005, relating to both facilities (Def.'s Exs. 20, 21), but the facilities remained mothballed and idle until 2007, when they were purchased by Global Ampersand LLC ("Global Ampersand").  Jt. Stip. ¶ 16.  Global Ampersand was, in turn, owned by Ampersand California Biomass Fund I ("CalBio").  Id.  Through Global Ampersand, CalBio "implement[ed] an extensive construction program to refurbish and upgrade the facilities with an eye toward commencing commercial operations."  Jt. Stip. ¶ 17; Def.'s Exs. 7, at 1 and 3, at 16.  Global Ampersand funded this process with a $26,500,000 secured note provided by D.E. Shaw Synoptics Portfolio III ("D.E. Shaw") on June 29, 2007 (Def.'s Ex. 13, at 30) and $3,900,000 in equity from CalBio (Abrahams Dep. 104:15-7, Aug. 15, 2016).  The D.E. Shaw note was secured by a priority lien on all real and personal property of Global Ampersand, and was subsequently amended to increase the principal amount to a maximum of $37,425,000.  Def.'s Exs. 18, at 2 and 19, at 10.

---

[1]    This opinion memorializes an oral ruling denying the motions issued on December 18, 2017.

[2]    This background is derived from the parties' stipulation of facts and the exhibits to the parties' respective motions for summary judgment and supplemental briefs.  This background should not be construed as findings of fact.

[3]    Plaintiffs' Motion for Partial Summary Judgment is referenced as Pls.' Mot., Defendant's Motion for Summary Judgment is referenced as Def.'s Mot., and the supplemental briefing is referred to as Pls.' Suppl. Br., Pls.' Second Suppl. Br., Def.'s Suppl. Br., and Def.'s Second Suppl. Br.  Exhibits attached to the cross-motions and responses are referenced as Def.'s Ex. or Pls.' Ex., and exhibits attached to the supplement briefing are referred to as Def.'s Suppl. Ex. or Pls.' Suppl. Ex.

**The Facilities Begin Producing Some Power in 2008**

Plaintiffs restarted the Chowchilla and Merced facilities on April 24, 2008, and July 5, 2008, respectively.  Pls.' Mot. 2.  There is no dispute that both facilities produced some power during 2008.  Def.'s Mot. 10, Exs. 3, 5, 7; Pls.' Exs. 2, at 9 and 5, at 3.  It is also undisputed that the Chowchilla facility sold some power to PG&E in December 2008, and the rest of the power produced by both facilities in 2008 was sold to the California Independent System Operator ("CAISO").  Def.'s Ex. 9, at 5.  CalBio began taking production tax credits ("PTCs") for the energy produced by both facilities in 2008, and continued to do so in 2009 and 2010.  Def.'s Exs. 12, 41, 42; Jt. Stip. ¶ 18.  The parties dispute whether Akeida was aware that CalBio took PTCs prior to the acquisition.

**Both Facilities Are Alleged to Have Violated Their Respective Permits From 2008 Through At Least 2010**

Soon after the facilities restarted in 2008, the San Joaquin Valley Unified Air Pollution Control District (the "District") and the United States Environmental Protection Agency ("EPA") began issuing Notices of Violation for operating in violation of the facilities' respective Authority to Construct ("ATC") permits.  Pls.' Ex. 12.  The facilities continued to receive Notices of Violation throughout 2009 and 2010.  Pls.' Exs. 14, 15.  Based upon these alleged violations, the United States and the District filed an 18-count Complaint against Merced and a 20-count Complaint against Chowchilla in February 2011, seeking injunctive relief against both facilities. Id.  The United States and the District alleged that the facilities failed to install necessary equipment (such as a certified Continuous Emission Monitoring System ("CEMS")) and Selective Non-Catalytic Reduction System ("SNCR")), failed to utilize other required equipment (such as a bin vent filter and truck tipper), and exceeded numerous emissions limits.  Id. at ¶¶ 88, 164, 174, 181).  All, or nearly all, of the violations were alleged to have continued until at least mid-2009. Id.

The District granted the Merced facility a Permit to Operate ("PTO") on March 1, 2010, and granted the Chowchilla facility a PTO on April 21, 2010.  Pls.' Ex. 5, at 1.  The parties dispute whether either facility should have been granted a PTO.  According to Plaintiffs, during the time the facilities were operated by CalBio "neither facility was operated in accordance with its permit requirements."  Pls.' Mot. 2; see also Pls.' Exs. 5, 11, 16.

**Akeida Acquires the Facilities in December 2010**

According to the Complaints filed against Plaintiffs by the United States in February 2011, both facilities had temporarily ceased operations in June 2010.  Pls.' Exs. 14, at ¶ 50 and 15, at ¶ 50.  On June 19, 2009, Akeida, through a wholly owned subsidiary, ACM Corp. 4, LLC, provided a $9,000,000 senior secured term loan to Global Ampersand.  Def.'s Ex. 13, at 1; Abrahams Dep. 105:7-14.  ACM Corp. 4, LLC, entered into a subordination agreement with D.E. Shaw at the time in order to make the ACM loan senior to D.E. Shaw's note.  Def.'s Ex. 19, at 11.  On December 16, 2010, ACM Corp. 6, LLC, a wholly owned subsidiary of Akeida Environmental, purchased for $350,000 an outstanding loan that had been made by D.E. Shaw to Global Ampersand in the principal amount of $39,509,999, with $17,968,269 in interest having accrued before the note was purchased.  Def.'s Exs. 17, at 2 and 18, at 2.  On December 28, 2010, Akeida Environmental,

through ACM California LLC, acquired 100% of CalBio's interest in Global Ampersand for a total purchase price of $1.4 million. Def.'s Ex. 8, at 17.

After the acquisition, Plaintiffs made improvements to the facilities in the amount of $14.9 million, consisting of $7.56 million and $7.39 million for Chowchilla and Merced, respectively. Def.'s Exs. 26, 27. Plaintiffs contend such improvements were necessary for the facilities to generate power legally. On April 25, 2011, the Federal District Court entered Consent Decrees against both facilities. Pls.' Exs. 20, 21. Plaintiffs represent that operations, which had ceased in June 2010, did not resume until August 11, 2011, when Plaintiffs provided the District and the United States with certifications of their compliance with the Consent Decrees. Pls.' Ex. 11, at 6, 8; Pls.' Suppl. Exs. 9-13, 36-38.

### The Facilities Resume Operations in 2011 and Apply for Section 1603 Grants; Their Applications Are Denied

Chowchilla applied for a Section 1603 grant on October 4, 2011. Jt. Stip. ¶ 4. Merced applied for a Section 1603 grant on October 21, 2011, but withdrew the application and then refiled on May 16, 2012. Jt. Stip. ¶ 5. Chowchilla claimed a Section 1603 grant of $12,282,984, and Merced claimed a Section 1603 grant of $12,299,273. Def.'s Exs. 24, at 5 and 25, at 5; Jt. Stip. ¶¶ 4-5. On their applications, Plaintiffs both reported that their properties were placed in service on August 11, 2011. Def.'s Exs. 24, 25. Treasury disagreed, stating:

> We have determined that most of the property which is the subject of the application was placed in service in 2008 and is ineligible for payment. Of the remaining costs indicated as eligible in the cost certification, we adjusted the construction loan interest expense to more closely reflect the interest incurred on the portion of the eligible cost between December 28, 2010 and August 11, 2011.

Def.'s Ex. 31.

Based on what it termed "eligible costs [incurred by the current taxpayer] since December 28, 2010," Treasury awarded $1,136,207 to Chowchilla and $1,136,519 to Merced. Id. Plaintiffs request the full amounts they applied for under the Section 1603 program.

### Discussion

### Jurisdiction and Legal Standards

The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (2016). The Tucker Act waives sovereign immunity and provides this Court with jurisdiction over specific categories of claims against the United States, including those claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . in cases not sounding in tort." § 1491(a)(1). "[T]he claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." United States v. Mitchell, 463 U.S. 206, 216-17 (1983) (internal citation and quotation marks omitted). Section 1603 is a money mandating statute that vests jurisdiction in this Court pursuant to the Tucker Act, as it does not afford the Government with discretion to deny an application for reimbursement so long as the requirements of Section 1603 are otherwise met. W.E. Partners II, LLC v. United States, 119 Fed. Cl. 684, 690 (2015);

LCM Energy Sols. v. United States, 107 Fed. Cl. 770, 772 (2012); ARRA Energy Co. I v. United States, 97 Fed. Cl. 12, 21-22 (2011).

In granting a motion for summary judgment, a court must find that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute is one which "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit . . . ." Id. at 248. "The moving party bears the burden of establishing the absence of any genuine issue of material fact." Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. 256-57. When considering a motion for summary judgment, the court draws all factual inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391. At the summary judgment phase, the court may not weigh any evidence but only "determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.

The Court reviews tax refund claims, including those predicated on Section 1603, on a de novo basis. W.E. Partners II, 119 Fed. Cl. at 690.

**Genuine Issues of Material Fact Preclude Summary Judgment for Either Party**

Plaintiffs ask this Court to determine that the facilities "could not have been placed in service in 2008, and [were] instead placed in service on August 11, 2011." Pls.' Mot. 1. Defendant asks this Court to instead grant summary judgment in its favor, contending:

> (1) as a matter of law, the facilities were placed in service in 2008 – prior to [section] 1603's eligibility window for facilities placed in service in 2009, 2010 and 2011; (2) the facilities at issue applied for and received production tax credits from 2008 through 2010 and are therefore ineligible for Section 1603 payments; and (3) [P]laintiffs failed to comply with material requirements of the Section 1603 program by repeatedly misrepresenting to the United States Department of Treasury the condition of the facilities.

Def.'s Mot. 1.

**When the Facilities Were "Placed in Service" Turns on Numerous Disputed Issues of Fact**

The parties agree that the facilities at issue are open-loop biomass facilities that could qualify for the Section 1603 program, and that the properties must have been "placed in service" between 2009 and 2011, in order to be eligible. Pls.' Mot. 11; Def.'s Mot. 6. However, the parties dispute whether the facilities were in fact "placed in service" in 2008, as Defendant contends, or in August 2011, as Plaintiffs contend.

Both parties rely upon Treasury Regulation § 1.46-3(d)(1)(ii) for the proposition that in order to determine whether and when the facilities were "placed in service," the Court must determine during which taxable year the facilities were "placed in a condition or state of readiness and availability for a specifically assigned function . . . ." 26 C.F.R. § 1.46-3(d)(1)(ii). The Court of Federal Claims has explained that it is the taxpayer that determines what the "specifically assigned function" of the asset is. RP1 Fuel Cell, LLC v. United States, 120 Fed. Cl. 288, 347-48 (2015) (internal citations and quotation marks omitted).

Plaintiffs state that the "specifically assigned function" of the two plants was to "sell base load power to PG&E in Central California," as set forth in the PG&E power purchase agreements. Hr'g Tr. 9. Plaintiffs further posit that "base load is defined in California to be a capacity factor of at least 60 percent measured annually." Id. Defendant vigorously opposes Plaintiffs' factual characterization of the facilities' function. See, e.g., Def.'s Second Suppl. Br. 4-8. In Defendant's view, the purpose of the facilities was to generate and sell power in any amount, and argues that the 60-percent capacity factor cited by Plaintiffs is an ideal, not a minimum, and it is not derived from California law. Id.

The Treasury Department's guidance regarding the Section 1603 program reiterates the precept of the regulations that "[p]laced in service means that the property is ready and available for its specific use." Def.'s Ex. 2, ("Treasury Guidance") at 5. Further, under this Treasury Guidance, in order to demonstrate that property has been "placed in service" the applicant must submit, among other things, "[a] report provided by the project engineer, or the equipment vendor, or an independent third party that certifies that the equipment has been installed, tested, and is ready and capable of being used for its intended purpose." Id. at 10.

Plaintiffs contend that this Court should follow the five-factor analysis set forth in Oglethorpe Power Corp. v. Comm'r, 60 T.C.M. (CCH) 850 (1990), in order to determine when the facilities were "placed in service." Although the Court of Appeals for the Federal Circuit has not addressed the applicability of the Oglethorpe analysis, the Court of Appeals for the Third Circuit cited Oglethorpe with approval in Armstrong World Industries, Inc. v. Comm'r, 974 F.2d 422, 434 (3d Cir. 1992); cf. Sealy Power Ltd. v. Comm'r, 46 F.3d 382, 393-94 (5th Cir. 1995) (rejecting the specific holding of Oglethorpe but nonetheless applying the same five-factor analysis). Oglethorpe has been applied repeatedly by the United States Tax Court. See, e.g., Brown v. Comm'r, 106 T.C.M. (CCH) 630 (2013); 85 Gorgonio Wind Generating Co. v. Comm'r., 68 T.C.M. (CCH) 1071 (1994); Valley Nat. Fuels v. Comm'r, 62 T.C.M. (CCH) 229 (1991), aff'd, 990 F.2d 1266 (9th Cir. 1993).

The Oglethorpe court, citing a number of I.R.S. revenue rulings, explained that whether "electric generating units" have been "placed in service" requires consideration of a number of factors, including whether:

1. the necessary permits and licenses for operating have been obtained;

2. all critical tests necessary for proper operation have been performed;

3. the unit has been placed in the control of the taxpayer by the construction contractor;

4. the unit has been synchronized with the transmission grid; and

6

5.  daily operation of the unit has begun.

Oglethorpe, 60 T.C.M. (CCH) 850.

Although they concede that Oglethorpe factors three and four weigh against their position, Plaintiffs argue that factors one, two, and five weigh in their favor.  Hr'g Tr. 48-49.

With respect to the first factor, Plaintiffs argue that operating licenses and permits had not been obtained in 2008, and the facilities were operating contrary to their Authorities to Construct ("ATCs") at all times prior to 2011; neither Chowchilla nor Merced had equipment necessary to meet the terms of their ATCs; Plaintiffs had not completed the tests required to convert the ATCs to Permits to Operate ("PTOs") until August 11, 2011; and while Chowchilla had been granted a variance in 2009, to allow it to continue operating, it was only for purposes of testing, and Merced was not allowed a variance at all.  Id.; Pls.' Mot. 15-17.

With respect to the second factor, Plaintiffs argue that neither facility had passed critical tests until after 2008.  Pls.' Mot.19.  According to Plaintiffs, there were several critical tests that were required to be performed on the facilities, including: a source test; a Relative Accuracy Test Audit ("RATA"); and a seven-day drift test.[4]  Chowchilla did not pass a source test for all emissions until August 28, 2009, and it continued to exceed permitted levels for certain chemicals until 2011.  Id.  Chowchilla did not conduct a RATA as of February 2011.  Id.  Merced did not conduct a source test at all until March 2009, was unable to pass a source test until October 20, 2009, and like Chowchilla, exceeded its emission limits in 2009 and 2010.  Id.  Merced first passed a RATA on September 25, 2009.  Id.  Additionally, Plaintiffs note that neither facility had critical systems that would have permitted testing (including a CEMS system and an SNCR system).  Id. at 20.  Plaintiffs cite the District's statement in a March 25, 2014 letter to Global Ampersand that "the facilities should not have been operating in June 2010" given that "[t]he Facilities had not installed all of the pollution control equipment and plant control equipment required by their [ATCs], nor had the Facilities completed the testing required by the ATCs."  Pls.' Ex. 10.

With respect to the fifth factor, Plaintiffs argue that neither facility began daily operations until August 2011, as the facilities suffered from repeated shutdowns and experienced compliance issues before that time.

Defendant, while agreeing that the five-factor analysis articulated in Oglethorpe should be applied, disagrees with the conclusion of the Oglethorpe court that the incapability of a power generating unit to generate power at levels near its rated capacity specific is significant to the "placed-in-service" determination.  Defendant further asserts that this Court should find that the intended use of the facility was to produce and sell energy in any amount, rather than to produce and sell energy at a particular level to a particular customer.  Hr'g Tr. 85.  Defendant contends that this Court should rely upon Sealy, 46 F.3d at 393-94, and find that regardless of whether the

---

[4]      The record does not contain sufficient evidence explaining the significance of these tests to the operation of the facilities.

amount of power generated was less than the full capacity of the facilities, generating any power would be sufficient to find that a facility was placed in service.[5]

Defendant further relies upon CalBio's taking production tax credits and depreciating the facilities in 2008 as indicia that the facilities had been placed in service at that time. Defendant notes that as of 2008, the facilities had been synchronized to the grid and Plaintiffs were in control of the facilities. Defendant also argues that Plaintiffs failed to establish that the facilities were not operated in accordance with their permits in 2008, or that the allegedly missing systems and other equipment were significant. Def.'s Reply 16. Finally, Defendant claims that if Plaintiffs' legal theory is correct—that a power plant is only placed in service if it complies with all aspects of its permits—then Plaintiffs would never have placed the property in service because they had ongoing environmental violations and outages subsequent to 2011.

There are genuine issues of material fact or gaps in the current record regarding when the facilities were placed in service, including the following:

1)    What the "specifically assigned function" of the facilities was;[6]

2)    To what extent the violations alleged in the Complaints and Notices of Violation served on Plaintiffs by the United States and the District impact whether the facilities were available for their intended purpose;

3)    Whether the PTOs were wrongly issued;

4)    The extent to which Plaintiffs were permitted to operate under the ATCs;

5)    The amount of power the Chowchilla facility sold to PG&E in December 2008, as compared to Chowchilla's operating capacity and its obligations under its PPA;

6)    Whether the facilities were obligated to sell power that was produced incidental to testing in 2008 on the spot market, and the significance of such sales to the placed-in-service date;

7)    What the purpose and function of the missing equipment and systems were;

8)    What the purpose and function of the tests that Plaintiffs assert had not been performed in 2008 were.

---

[5]    Further, Defendant observes that even if the purpose of the facilities was to sell power to PG&E in particular, Chowchilla at least did so in 2008.

[6]    The "specifically assigned function" of the facilities is dependent upon the taxpayer's intent, and issues of intent are typically not appropriate for resolution on summary judgment. See, e.g., Albert v. Kevex Corp., 729 F.2d 757, 763 (Fed. Cir. 1984) ("Intent is a factual matter which is rarely free from dispute, and we do not see how it can be said that it is free from dispute in this case.").

## The Government Has Not Established on the Summary Judgment Record that Plaintiffs Should be Bound by Tax Positions Taken by CalBio

Defendant argues that the doctrine of "quasi estoppel," also known as the "duty of consistency," operates to bind Plaintiffs to the tax position taken by CalBio, their prior owner. Def.'s Mot. 28.  The duty of consistency prevents (1) a taxpayer from adopting a position in one year and (2) subsequently adopting a contrary position regarding the same facts or transaction (3) after the statute of limitations has expired regarding the first position.  Lewis v. Comm'r, 18 F.3d 20, 21 (1st Cir. 1994).  Plaintiffs are not the same taxpayer that took PTCs and depreciation on the facilities—CalBio was the taxpayer at the time, whereas the current taxpayer is Akeida Environmental.  Acknowledging this, Defendant nonetheless argues that "Akeida Environmental Fund's interest in the facilities is sufficiently related to CalBio's interest such that the Court should hold Akeida to the positions taken by CalBio."  Def.'s Suppl. Br. 22 (internal citations omitted).

To support its contention that CalBio and Akeida's interests in the facilities are sufficiently related, Defendant asserts that (1) Akeida is bound to CalBio's determination that the facilities were placed in service in 2008 by dint of being the transferee of the facility; (2) Akeida was aware as of the time its subsidiary, ACM Corp. 4, LLC, an Akeida-owned investment vehicle, made a loan to CalBio in 2009, to assist CalBio's efforts to refurbish the facilities, that CalBio was taking PTCs; and (3) Akeida desired that CalBio take the PTCs, and benefited from them insofar as it further secured the 2009 loan for Akeida's subsidiary, ACM Corp. 4, LLC.  Def.'s Suppl. Exs. 2, at 17 and 3, at 4; Def.'s Exs. 8, 13.

Material facts are disputed regarding the interrelation between Akeida and CalBio, including their financial relationship, including:

1)      What the interrelation between Akeida and CalBio was;

2)      Whether Akeida knew that CalBio was claiming PTCs or depreciation;

3)      If Akeida knew CalBio was claiming PTCs or depreciation, whether Akeida requested it to do so;

4)      If Akeida knew CalBio was claiming PTCs or depreciation, whether Akeida required CalBio to do so.

## Whether Plaintiffs "Materially" Violated the Terms of the Section 1603 Program is Not Amenable to Summary Judgment

Defendant argues that even if Plaintiffs' facilities were not "placed in service" in 2008, and even if Plaintiffs are not bound by the tax positions taken by CalBio, Defendant is entitled to summary judgment because Plaintiffs violated material terms of the Section 1603 program. Specifically, Defendant contends that Plaintiffs falsely represented to Treasury in 2013, 2014, and 2015, that Plaintiffs had not experienced any interruptions in production.  According to Defendant, this statement constituted a material misrepresentation that disqualified Plaintiffs from receiving a Section 1603 grant.  Plaintiffs, on the other hand, contend that they did not make any misrepresentation to Treasury, that they had disclosed enough information to indicate there had been some temporary shutdowns, and that even if Plaintiffs made any misrepresentation to Treasury, such misrepresentation was not material.

Treasury issued guidance, incorporating Terms and Conditions on its administration of the Section 1603 program, requiring Section 1603 grant awardees to submit an annual report to Treasury for five years following the time when the property was placed in service. This annual report included a certification that "the property has not been disposed of to a disqualified person and that the property continues to qualify as specified energy property (as that term is used in Section 1603)." Def.'s Ex. 1, at 2. Condition 6b includes a requirement for the applicant to repay all or portions of the grant to Treasury "[i]f the property is disposed of to a disqualified person and/or ceases to qualify as a specified energy property (hereinafter "disqualifying event") within five years from the date the property is placed in service[.]" Id. Condition 8a requires the applicant to agree that Treasury may disallow all or part of a Section 1603 payment "[i]f the applicant materially fails to comply with any term of the award, whether stated in a Federal statute or regulation, program guidance, these Terms and Conditions, or a notice of award[.]" Id. at 3.

In the specific form Treasury provided for the annual reports, Treasury asked applicants, among other things, if they experienced "any interruptions in production during the year, other than routine maintenance[.]" Def.'s Exs. 32-37. Plaintiffs certified in their annual reports for 2013, 2014, and 2015, that they had not experienced any such interruptions in production. Id. at 3, ¶¶ 4.2, 5. Defendant asserts that these statements were false because, in a lawsuit Plaintiffs brought against the facilities' former operator, Deltaway Operations Services, LLC ("Deltaway"), Plaintiffs alleged that Deltaway's mismanagement resulted in both plants shutting down in whole or in part for unspecified, temporary periods. Def.'s Ex. 38, at ¶¶ 36-41, 45, 70. Defendant argues that allegations in the Deltaway Complaint constitute judicial admissions that "render the facts contained therein indisputable." Litman v. United States, 78 Fed. Cl. 90, 135 (2007) (internal citation and quotation marks omitted). Accordingly, Defendant argues that because Plaintiffs admitted in the Deltaway Complaint that the facilities had been shut down temporarily at various times, Plaintiffs' certifications to the contrary in 2013, 2014, and 2015, should be treated as false. Def.'s Mot. 30-33.

Plaintiffs respond by asserting that David Kandolha, who signed the reports as the Plaintiffs' "Manager," made the representations in good faith, believing that the reports were not asking about temporary shutdowns. According to Plaintiffs, Mr. Kandolha understood the purpose of the reports was to certify that the plants were still operating in order to satisfy Treasury that no recapture of grant monies was warranted. Kandolha Dep. 91-92. The Treasury Guidance provides that "[t]emporary cessation of energy production will not result in recapture provided the owner of the property intends to resume production at the time production ceases." Def.'s Ex. 2, at 19. According to Plaintiffs, as temporary shutdowns would not constitute an interruption in production sufficient to trigger any recapture, Mr. Kandolha believed it was accurate to state that there had not been reportable interruptions in production. Additionally, as the representation would not have triggered any recapture, Plaintiffs contend the representation cannot be deemed material. Plaintiffs also claim that they submitted documentation along with the annual reports for each year that would have permitted Treasury to determine there had been temporary shutdowns.

There are genuine issues of fact regarding Mr. Kandolha's understanding of the reports and belief in making these representations, the extent or duration of the shutdowns alleged in the Deltaway case, and whether the information Plaintiffs provided Treasury along with the annual reports indicated that there were temporary shutdowns.

**Defendant Has Not Established on Summary Judgment that the Statute Precludes Plaintiffs From Recovering Because the Prior Taxpayer Took PTCs**

In the alternative, Defendant asserts that, as a matter of law, CalBio's conduct in taking PTCs for power produced by the facilities—properly or otherwise—disqualifies property that was part of those facilities from eligibility under Section 1603.

**Section 1603 and its Borrowed Definitions**

Section 1603 requires the Secretary of the Treasury to provide a grant, upon application, to individuals or entities that "place[] in service specific energy property."  Section 1603(d) provides that "the term 'specific energy property'" includes "[a]ny qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code."[7]  Defendant contends that the facilities are ineligible for the 1603 grant because they cannot meet the definition of "qualified property."

Section 48(a)(5)(D) of the Internal Revenue Code defines "qualified property" as property:

**(i)** which is--

   **(I)** tangible personal property, **or**

   **(II)** other tangible property (not including a building or its structural components), **but only** if such property is used as an integral part of the **qualified investment credit facility**, and


**(ii)** with respect to which depreciation (or amortization in lieu of depreciation) is allowable.

Section 48(a)(5)(D) (emphasis added).

Plaintiffs contend that the property at issue constitutes "tangible personal property" subject to Subpart I. Defendant does not substantively disagree with that classification, but posits that the condition in Subpart II, "other tangible property,"—a condition Defendant claims the facilities cannot meet—also applies to Subpart I, "tangible personal property."  Defendant would thus import the phrase "but only if such property is used as an integral part of the qualified investment credit facility" into the definition of "tangible personal property."

The definition of a "qualified investment credit facility" includes another condition, stating that a facility can only be "qualified" if "no credit has been <u>allowed</u> under section 45" with respect to such facility "and the taxpayer makes an irrevocable election to have this paragraph apply" to such facility.  Section 48(a)(5)(C) (emphasis added).  There is no dispute that the taxpayer who owned the facilities from 2006 through December 28, 2010, CalBio, claimed PTCs under Section 45 regarding both facilities in 2008, 2009, and 2010. Jt. Stip. ¶ 18.  Defendant contends that this

---

[7]    With the exception of Section 1603, any reference to a "section" is to a section of the Internal Revenue Code of 1986, 26 U.S.C. <u>et seq.</u>

means the IRS "allowed" a credit to CalBio and therefore, that property in these facilities cannot meet the definition of "qualified property."

There are two major obstacles to construing the statue as Defendant asks.

First, Defendant must rewrite the definition of "qualified property" by importing a condition into "tangible personal property" which, by the clear words of the statute, is not there.

Second, Defendant assumes, without citing any legal authority, that because CalBio took a Section 45 credit and the IRS did not challenge that tax position, it was legally "allowed" within the meaning of the statute.

Plaintiffs contend that the property at issue is "tangible personal property," not "other tangible property."[8]  The statutory definition is different for each.

"[O]ther tangible property" may only qualify for a Section 1603 grant if that property is "used as an integral part of the qualified investment credit facility," and a "qualified investment credit facility" is one for which "no credit has been allowed under section 45."  If "other tangible property" is at issue, Plaintiffs could be barred from obtaining a Section 1603 grant for such property if the prior taxpayer had been "allowed" a Section 45 credit for the facility containing such property—"allowed" being a term whose meaning the parties have not addressed in their briefing.

The same is not true of "tangible personal property" because Subpart I, unlike Subpart II, does not expressly provide that the property must be an "integral part of the qualified investment facility," and thus one for which "no credit has been allowed under section 45," to constitute "qualified property."

Defendant recognizes this dichotomy but asserts that formalistically applying the plain language of the statute would frustrate Congressional intent and lead to absurd results.  Defendant posits that "tangible personal property" must also be an "integral part of the qualified investment credit facility," in order to qualify for a Section 1603 grant even though that condition is not stated in Subpart I, "tangible personal property."

None of Defendant's arguments persuade the Court to vary the otherwise plain language of the statute.[9]  As Defendant correctly stated, the statute has been amended more than once since

---

[8]    The record at this stage of the proceedings does not indicate why the property at issue constitutes "tangible personal property" rather than "other tangible property."

[9]    Defendant asserts that the title of Section 1603 and its Legislative History support Defendant's construction, but the Court does not resort to these construction devices given the clear language of the statute.  Defendant also warns that if the plain language of the statute prevails it would permit Section 1603 grants for property unrelated to the production of energy, but this argument fails as well, as: (1) the applicable Treasury Guidance provides that all qualified property must be "an integral part of the facility" in order to be eligible for a Section 1603 grant (Def.'s Ex. 2, at 11); and (2) this hypothetical is not before the Court, as Plaintiffs seek to be compensated for enumerated property that at least facially appear to be integral parts of the facilities—such as a

it was initially promulgated in 2009, including to correct a "technical" error in wording that was to apply retroactively. See, e.g., Pub. L. No. 112-240, § 407(c)(2), (d)(3). That Congress corrected certain aspects of Section 1603, but did not change the language of Subpart I to add the condition in Subpart II, suggests that Congress intended to omit that condition. Defendant has not established that Plaintiffs are statutorily barred from recovering Section 1603 grants on the theory that the property is part of facilities for which CalBio received section 45 credits.

Second, Defendant has not addressed the meaning of "allowed" in Section 48(a)(5)(C). Defendant's arguments are premised on the assumption that Section 48(a)(5)(C)'s reference to Section 45 credits having been "allowed" means that the taxpayer claimed those credits and the IRS did not challenge its claim without regard to whether those credits should have been allowed as a matter of law. The parties have not briefed the definition of "allowed" and the Court cannot conclude at this stage of the proceedings whether, as a matter of law, CalBio properly claimed Production Tax Credits in 2008, 2009, or 2010, or whether such PTCs were legally "allowed" within the meaning of the statute.

## Conclusion

Plaintiffs' motion for partial summary judgment is **DENIED**, and Defendant's cross-motion for summary judgment is **DENIED**.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

fluidized bed combustor, fuel conveyance system, and turbines and generators. See Def.'s Exs. 26-27.